The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner John A. Hedrick, and the briefs before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representative, or amend the Opinion and Award, except with minor modifications.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. On 24 August 1994, defendant was self-insured through USECA, now known as CompSolutions. That fund's third party administrator is Trigon Administrators.
2. On 24 August 1994, defendant regularly employed three or more employees.
3. Two sets of plaintiff's medical records, received from plaintiff's counsel on 2 April 1997, are admitted into evidence.
***********
Based upon all of the competent evidence of record, the undersigned makes the following additional
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was thirty-five years old. He had completed the ninth grade of high school and later obtained a GED. During plaintiff's childhood, his father owned a welding business. When plaintiff was sixteen years old, his father began to teach him the welding trade. Plaintiff obtained the bulk of his experience as a welder after his twenty-fifth birthday.
2. Plaintiff's employment history consisted of work on a tobacco farm and in the construction industry. In the construction industry, plaintiff worked as a welder, a painter, a carpenter and a general laborer. Plaintiff also performed maintenance work for a textile plant. For five years he worked for a recreational boat manufacturer.
3. In the years immediately prior to 1994, plaintiff worked for his brother for approximately twenty months. Plaintiff's brother owned a steel erecting and fabricating business. He also worked periodically for N.C. Steel in Raleigh, North Carolina. Plaintiff was a long-time acquaintance of the owner of N.C. Steel. While working for N.C. Steel in early 1994, plaintiff accepted employment as a welder for an employer that was performing construction work on the hospital at the Cherry Point military base. At the conclusion of the hospital construction project, plaintiff returned to work for N.C. Steel. During the spring or summer of 1994, plaintiff terminated his employment with N.C. Steel due to job dissatisfaction.
4. Defendant was a corporation that was divided into four units: a real estate unit, a construction unit that was primarily involved in roofing, a food and beverage unit and a communications unit. In July 1994, defendant obtained a contract to perform roofing on a private residence. The residence also required painting. Defendant was unable to find a painting contractor that would paint the residence. At the suggestion of one of its employees, defendant contacted plaintiff and solicited him to perform the painting.
5. Defendant requested that plaintiff submit a bid for performing the painting work. Plaintiff declined to do so, informing defendant that he was uncomfortable with the financial risk associated with submitting a bid. Plaintiff and defendant then agreed that plaintiff would perform the work and be compensated at the rate of $7.25 per hour. On 5 July 1994, plaintiff painted the house, working for a total of 8.25 hours.
6. To be paid for his work, plaintiff presented himself to defendant's business office where a "Contract Labor Bill" was prepared. Plaintiff signed the bill. The bill set forth plaintiff's name and address, identified the work performed, the rate of pay, the number of hours worked and the total amount paid to plaintiff for his work.
7. In August 1994, defendant was constructing a Planet Rock Cafe (hereinafter PRC project) in Wilmington, North Carolina. Defendant was operating under a deadline for completion of the construction project and was in need of additional labor to complete the project on time. At the suggestion of one of its employees, defendant contacted plaintiff to determine whether he would be interested in working on the PRC project.
8. Plaintiff accepted defendant's offer to work on the project and presented himself to the site on 10 August 1994. Plaintiff and defendant again agreed that plaintiff would be paid on an hourly basis. Plaintiff's work on this project included painting, sweeping, vacuuming, trim carpentry, varnishing and other "odds and ends". Defendant provided all tools and materials used by plaintiff while working on the PRC project.
9. Defendant's communications unit owned three communication towers. In August, 1994, one of the towers needed repairs to reinforce areas that had been weakened by rust. Another tower, located on the same site as the tower that needed repairs was equipped with an extra cable. Defendant desired to "harvest" the extra cable for use elsewhere.
10. Defendant, through its dealings with plaintiff, had become aware that plaintiff was an experienced welder and steel worker. Defendant explained to plaintiff the repairs that were needed on its tower and asked plaintiff if he would consider making the repairs. Plaintiff and defendant agreed that plaintiff should inspect the damaged tower to determine whether it could be repaired and, if so, what materials and methods should be used to make the repairs.
11. On 22 August 1994 or 23 August 1994, plaintiff and Arthur Hopfer went to the tower site and inspected the tower. Mr. Hopfer was employed by defendant as its maintenance superintendent. Plaintiff and Mr. Hopfer climbed the tower to inspect its condition. After inspecting the tower, plaintiff discussed repair methods with Mr. Hopfer. Plaintiff proposed a method of repair to defendant's president. Defendant's president responded, "Okay, do it." Plaintiff agreed to perform the necessary work. Plaintiff declined to submit a bid for the work because he preferred to be paid on an hourly basis, avoiding the financial risk associated with a low bid.
12. Sometime prior to 24 August 1994, defendant's employees, including Mr. Hopfer, undertook to retrieve the extra cable from the other tower on defendant's tower site. Plaintiff assisted defendant's employees in the retrieval of the cable. Plaintiff and Mr. Hopfer worked from a position on the tower, while the remainder of the crew worked on the ground. Plaintiff worked for at least six hours helping to retrieve the cable.
13. Defendant prepared, and plaintiff signed a "Contract Labor Bill" which provided that plaintiff worked thirty-one hours for defendant from 10 August 1994 through 12 August 1994. A notation on the bill indicated that plaintiff worked twenty-two hours at the PRC project for which he was paid $6.25 per hour. The notation also indicated that he worked nine hours at the tower site for which he was paid $7.50 per hour.
14. Defendant prepared, and plaintiff signed a "Contract Labor Bill" which provided that plaintiff worked fifty-five hours for defendant from 13 August 1994 through 17 August 1994. A notation on the bill indicated that all of these hours were worked at the PRC project and that he was paid $6.25 per hour.
15. After plaintiff agreed to perform the tower repair work, defendant purchased all materials necessary for plaintiff to make the repairs, including steel and welding rods. Defendant owned an acetylene torch and ropes and pulleys that were to be used in the repair project. Defendant provided this equipment to plaintiff. Defendant did not own an arc welder. Defendant leased an arc welder for plaintiff to use in making the repairs. Plaintiff provided no materials used in making the repairs. The only equipment he provided was his safety harness and lanyard. Mr. Hopfer also owned a safety harness he used when working on towers.
16. On 24 August 1994, plaintiff met Mr. Hopfer at defendant's offices. Mr. Hopfer transported plaintiff and the repair materials to the tower site in a vehicle owned by defendant. Plaintiff did not own a work truck. Mr. Hopfer went to the tower site to act as a safety officer and to assist plaintiff in making the repairs. Mr. Hopfer acted as a safety officer because defendant did not allow anyone to go to the towers unless they were accompanied by a safety officer. Mr. Hopfer had no welding expertise and did not supervise plaintiff's welding.
17. Once on the site plaintiff climbed the tower and Mr. Hopfer remained on the ground. Mr. Hopfer assisted plaintiff by raising repair materials to plaintiff using a bucket, rope and pulley mechanism. Mr. Hopfer also provided plaintiff with water to drink. When plaintiff ran out of welding rods, Mr. Hopfer left the site to purchase additional rods. Mr. Hopfer also busied himself extinguishing grass fires that were ignited by sparks from plaintiff's welding activities. Mr. Hopfer monitored plaintiff's technique and physical condition.
18. At approximately 2:30 p.m., plaintiff was completing the tower repairs. After welding one side of a section of steel, plaintiff repositioned himself and his safety lanyard so that he could weld the opposite side of the steel section. When he repositioned his lanyard, he unintentionally placed it onto a section of hot steel. Mr. Hopfer, having observed the repositioning, challenged plaintiff with regard to the wisdom of the arrangement. Plaintiff assured Mr. Hopfer that the arrangement was satisfactory. The heat burned through the lanyard and plaintiff fell approximately sixty feet to the ground.
19. Plaintiff did not work for any other employer between 5 July 1994 and 10 August 1994.
20. On 18 August 1994, plaintiff completed a Form W-9, Request for Taxpayer Identification Number and Certification. Defendant did not withhold taxes from payments made to plaintiff for work he performed for defendant.
21. During the time that plaintiff worked on the PRC project, defendant's president had an opportunity to observe plaintiff and the work he was performing. Defendant's president was impressed with plaintiff's work and manner. On at least one occasion prior to 24 August 1994, defendant's president asked plaintiff if he would "go to work" for defendant. Plaintiff declined this offer, stating that "[h]e did not want the responsibility of nine to five every week."
22. Defendant's president had authority to terminate plaintiff if he was not satisfied with the work he was performing at the PRC project.
23. Before plaintiff performed the tower repairs and cable removal work, defendant informed plaintiff that it had other work available involving towers, specifically including a water tower located in Surf City, North Carolina.
24. Plaintiff's employment with defendant-employer in August, 1994, while repairing defendant's towers was irregular, unpredictable, sporadic and brief in nature. However, plaintiff was engaged on 24 August 1994 in the course of the trade, business, profession or occupation of his employer. One of the defendant-employer's business arms was a communication business. Plaintiff was engaged on 24 August 1994 in employment incident to the desired operation of defendant-employer's business.
25. While employed by N.C. Steel, plaintiff earned $10.00 (ten dollars) per hour, plus overtime. While employed as a welder on the Cherry Point Hospital project, plaintiff earned approximately $1,000.00 per week for three months. Plaintiff earned $7.50 per hour while working on defendant's towers, $7.25 per hour for house painting and $6.25 per hour when working on the PRC project.
26. Plaintiff was unemployed for approximately one month before, and one month after 5 July 1994.
27. Plaintiff did not work for defendant for fifty-two weeks prior to 24 August 1994. Calculating plaintiff's average weekly wage by dividing his wages by the number of weeks and parts thereof that he did work for defendant, would not obtain a result that is fair and just to both parties. There is no factual basis for calculating plaintiff's average weekly wage based upon the earnings of a person of the same grade and character employed in the same class of employment in the same community.
28. The average of the hourly wages defendant paid plaintiff is $7.00 per hour. Calculating plaintiff's average weekly wage by multiplying this hourly wage by 40 (assuming an average work week of 40 hours), would result in an average weekly wage of $280.00, a result that is fair and just and most nearly approximates the wages plaintiff was earning at the time of his injury.
29. As a result of his fall, plaintiff sustained a lacerated scalp, open left pylon ankle fracture, left subtrochanteric femur fracture, left distal tibia-fibula fracture and a T12 compression fracture. Plaintiff was treated at Onslow Memorial Hospital before being transferred to University of North Carolina Hospitals. On 24 August 1994, plaintiff underwent surgery for drainage and external fixation of his left distal tibia-fibula fracture. His scalp laceration was closed at the same time. On 26 August 1994, plaintiff underwent surgery for an anterior T12 corpectomy, Z plate fusion and placement of a fibular strut graft from T11 to L1. An arthrodesis of T11 to L1 was also performed. On 31 August 1994, plaintiff underwent a third surgery. This procedure was performed to reduce and fix the left femur fracture and internally fix the left distal tibia fracture. At the time of his discharge from UNC Hospitals, plaintiff had complete L4 level motor paralysis and incomplete L4 sensory loss. He was then transferred to Pitt Memorial Hospital where he was admitted for a course of physical rehabilitation intended to maintain plaintiff's medical stability, improve his strength and endurance, improve his ability to perform activities of daily living, improve his ability to transfer into and out of a wheel chair and to increase his mobility using a wheelchair. As of the date of the hearing, plaintiff was able to ambulate, but only with the use of crutches.
30. As a result of the incident on 24 August 1994, plaintiff was rendered incapable of earning wages from defendant or any other employer from that date through the date of the hearing in this case.
***********
The foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 24 August 1994, plaintiff was a casual employee of defendant when he engaged in welding for defendant-employer, but the work plaintiff performed was in the course of the trade, business or occupation of his employer and the casual nature of the employment alone would not exclude plaintiff from benefits under the Workers' Compensation Act. N.C. Gen. Stat. §97-2(2); Boyd v. Mitchell, 48 N.C. App. 219 (1980).
2. On 24 August 1994, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
3. On 24 August 1994, plaintiff's average weekly wage was $280.00, yielding a compensation rate of $186.68 per week. N.C. Gen. Stat. § 97-2(5).
4. As a result of plaintiff's work-related incident on 24 August 1994, plaintiff is entitled to payment of temporary total disability compensation at the rate of $186.68 per week from 24 August 1994 and continuing until order of the Industrial Commission allowing defendant to terminate payment of temporary total disability compensation. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendants provide all medical treatment arising from this injury by accident to the extent it tends to effect a cure, give relief or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $186.68 per week from 24 August 1994 and continuing until order of the Industrial Commission allowing defendant to terminate payment of temporary total disability compensation. This amount, to the extent that it has accrued, shall be paid in a lump sum, subject to the attorney's fee approved in Paragraph 3.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of his compensable injury on 24 August 1994, when bills for the same shall have been submitted to the Industrial Commission pursuant to approved Industrial Commission procedure.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sum due plaintiff shall be deducted from that amount and paid directly to plaintiff's attorney. Thereafter, plaintiff's attorney shall receive every fourth compensation check due plaintiff.
4. Defendant shall pay all costs.
This the _____ day of February, 1998.
 S/ __________________ THERESA B. STEPHENSON DEPUTY COMMISSIONER
CONCURRING:
S/ ____________________ LAURA K. MAVRETIC COMMISSIONER
S/ ____________________ BERNADINE S. BALLANCE COMMISSIONER